## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**RANDALL LEE CONRAD,**

      **Plaintiff,**

**v.**                                              **Civil Action No. 3:12cv133**
                                                              **(Judge Groh)**

**PERDUE, Warden; FEDERAL**
**BUREAU OF PRISONS; DEPARTMENT**
**OF JUSTICE; CREASY, Counselor;**
**WILSON, Secretary; THROPE, Officer;**
**and Numerous FCI Gilmer Employees,**
**Officers, Secretaries, Counselors, Case**
**Managers, etc., construed as JOHN DOEs**
**and/or JANE DOEs,**

      **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

The *pro se* plaintiff, then incarcerated at FCI Gilmer in Glenville, West Virginia,[1] initiated this case on November 13, 2012 by filing a <u>Bivens</u>[2] civil rights complaint against the above-named defendants. After correcting certain deficiencies with his pleadings, including re-filing his complaint on a court-approved form, on December 3, 2012, the plaintiff was granted permission to proceed *in forma pauperis* and directed to pay an initial partial filing fee ("IPFF") by January 2, 2013. On January 2, 2013, the plaintiff wrote to the Court to advise that although he had sufficient money in his account to pay the IPFF and had twice requested that the prison trust fund officer pay it, it had not been done. By March 18, 2013, having still not received plaintiff's IPFF, an Order was entered, giving plaintiff until April 1, 2013, to show cause why his

---

[1] Subsequent to the filing of his complaint, the plaintiff was transferred to FCI Coleman, in Coleman, Florida.

[2] <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971)(a case in which the Supreme Court created a counterpart to 42 U.S.C. §1983 and authorized suits against federal employees in their individual capacities).

case should not be dismissed for failure to prosecute. That same day, plaintiff filed a motion for an extension of time in which to pay the fee.[3] By Order entered March 19, 2013, the plaintiff's previously-assessed IPFF was waived, although he was still responsible for paying the entire fee.

On March 19, 2013, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time. Plaintiff was given an additional thirty days in which to identify the John and/or Jane Doe defendants, and summonses were issued for the remaining defendants that same day.

On May 21, 2013, the defendants filed a Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment. Because plaintiff was proceeding *pro se*, a Roseboro Notice was issued on June 3, 2013. On June 6, 2013, plaintiff filed a motion for an extension of time in which to respond. On June 24, 2013, plaintiff filed his response, along with a motion to amend his response once the defendants re-provided certain documents in a more legible format. On July 9, 2013, an Order was entered, directing the defendants to provide legible copies and granting plaintiff's motion to amend his Roseboro response once he received them. Defendants' supplemental response was filed on July 15, 2013. On August 16, 2013, plaintiff filed his amended Roseboro response.

Accordingly, this case is before the undersigned for a report and recommendation on the defendants' dispositive motion.

## II. The Pleadings

### A. The Complaint

---

[3] The *pro se* law clerk communicated by telephone with the BOP's general counsel on several occasions between January – March, 2013, regarding plaintiff's IPFF. It was determined that plaintiff had already has deductions being taken from his Prisoner Trust Account for filing fees for at least two prior cases filed, that are "in front of" the filing fee for the present case, and payment of this case's filing fee will not begin until those obligations have been satisfied. Plaintiff had no income at the time, thus, it was unlikely he would be able to pay the IPFF in the near future.

Plaintiff contends that inmates at FCI Gilmer, including himself, were continually exposed to the second-hand smoke of BOP employees who smoked on the job outdoors, in violation of BOP Program Statement §551.160. Plaintiff contends that his Eighth Amendment rights were violated when he was required to repeatedly walk through clouds of second-hand smoke several times daily, and that it affected his health. He alleges that the defendants refused him medical attention for his symptoms. Further, he alleges he was retaliated against for filing grievances over the issue. Finally, he contends that the defendants denied his access to the administrative grievance process by throwing away or not turning in his BP-8s and BP-9s when he filed them.

The plaintiff seeks injunctive relief in the form of a directive forcing FCI Gilmer staff to immediately stop smoking inside the compound; a transfer to a smoke-free FCI, so that he will not have to deal with retaliation from FCI Gilmer staff; and a transfer to a medical facility to receive free medical monitoring, in the form of biannual check-ups to screen him for "all types of cancer" attributable to second-hand smoke. He also requests a jury trial; compensation for all medical needs; and compensatory damages for his physical and mental/emotional pain and suffering, in the amount of $50,000,000.00.[4]

**B. Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment**

In support of their Motions, the defendants allege that:

1) the plaintiff failed to exhaust his administrative remedies;

2) plaintiff has failed to state a claim upon which relief can be granted;

3) plaintiff's claim for injunctive relief is moot;

4) plaintiff cannot establish that the defendants were personally involved in any violation of his constitutional rights;

---

[4] Plaintiff's original complaint requested compensatory damages of $500,000.00; his court-approved form complaint requested $50,000.000.00

5) *respondeat superior* is inapplicable in a <u>Bivens</u> action;

6) claims against the defendants in their official capacities must be dismissed; and

7) the defendants are entitled to qualified immunity.

## C. **Plaintiff's Response**

The plaintiff reiterates his claims and attempts to refute the defendants' arguments on the same.

### III. **Standard of Review**

## A. **Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993); <u>see also</u> <u>Martin</u>, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court

4

noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Conley</u>, 550 U.S. at 555 (citations omitted).  Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," <u>Id</u>.  (citations omitted), to one that is "plausible on its face," <u>Id</u>. at 570, rather than merely "conceivable."  <u>Id</u>.  Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I. DuPont de Nemours & Co.</u>, 324 F.3d 761, 765 (4th Cir.2003) (citing <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 213 (4th Cir. 2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir. 2002)).  In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009).  Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim.  <u>Id</u>.

**B.  <u>Summary Judgment</u>**

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of

whether genuine issues of triable fact exist.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 *1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  <u>Celotex</u> at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  <u>Matsushita Electric Industrial Co. V. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id</u>.  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u> at 256.  The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment.  <u>Id.</u> at 248.  To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  <u>Id</u>.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987).  Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation.  <u>Anderson</u> at 248.  Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  <u>Matsushita</u> at 587 (citation omitted).

## IV. <u>Analysis</u>

### A. <u>Federal Bureau of Prisons ("BOP") and Department of Justice ("DOJ")</u>

The plaintiff has named both the BOP and DOJ as defendants in this matter.

In order to state a successful claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a *person* acting under color of state law deprived him of a right guaranteed by the Constitution or federal laws. Rendall-Baker v. Kohn, 457 U.S. 830, 838 (1982) (emphasis added). Because Bivens was created as a counterpart to § 1983, so that individuals may bring a suit against a federal actor for violating a right guaranteed by the United States Constitution or federal law, see Bivens, 403 U.S. at 395, it stands to reason that in order to state a successful claim under Bivens, a plaintiff must likewise demonstrate that a "person" acted under color of federal law to deprive him of a right guaranteed by the Constitution or federal laws.

Neither a particular federal correctional facility nor the Federal Bureau of Prisons itself is a "person" for purposes of a Bivens action. See Correctional Services Corp. v. Malesko, 534 U.S. 61, 71 (2001)(a federal prisoner alleging a constitutional deprivation may not bring a Bivens claim against the United States or the BOP; his only remedy lies against the individual); see also F.D.I.C. v. Meyer, 510 U.S. 471, 475-476 & 484-486, 114 S.Ct. 996 (1994)(Bivens actions must be brought against federal agents not federal agencies); Ruiz-Rivera v. I.R.S., 93 Fed.Appx. 244, 245 (1st Cir 2004)(Bivens actions against federal agencies are barred); Roach v. Burch, 825 F. Supp. 116 (N.D.W.Va. 1993); Brooks v. Pembroke City Jail, 722 F.Supp. 1294, 1301 (E.D.N.C.1989); see also Will v. Michigan Dept. Of State Police, 491 U.S. 58, 71 (1989) ("Neither a State nor its officials acting in their official capacities are 'persons' under § 1983"); Preval v. Reno, 203 F.3d 821 (4th Cir. 2000)(unpublished) ("[T]he Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under §42 U.S.C. 1983"); Roach v. Burch, 825 F. Supp. 116 (N.D.W.Va. 1993) (The West Virginia Regional Jail Authority is "in effect the State of West Virginia" and is not a person under § 1983).

Accordingly, the BOP and the DOJ are not proper parties to this suit and should be dismissed.

## B. Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). A Bivens action, like an action under 42 U.S.C. § 1983, is subject to the exhaustion of administrative remedies. Porter v. Nussle, 534 U.S. 516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[5] and is required even when the relief sought is not available. Booth *supra* at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter, 534 U.S. at 524 (citing Booth, 532 U.S. at 741) (emphasis added). Moreover, an inmate may procedurally default his claims by failing to follow the proper procedures. See Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378 (2006) (recognizing the PLRA provisions contain a procedural default component).

The Bureau of Prisons has established a three-tier Administrative Remedy Procedure, set forth in Title 28 of the Code of Federal Regulations, for the formal review of complaints filed by inmates relating to the conditions of their confinement. Title 28 C.F.R. § 542.10, *et seq*. Under this system, an inmate must first request an informal resolution by presenting an issue of concern informally to a staff member. Title 28 C.F.R.§542.13(a). If the informal resolution fails, or if an inmate is dissatisfied with the informal response, or if there is *no* response, the inmate may then submit a Request for Administrative Remedy, in the form of a formal written complaint, on the

---

[5] Id.

proper form (a BP-9), to the Warden of the institution within twenty (20) calendar days of the date of the incident upon which the complaint is based. Title 28 C.F.R. § 542.14(a). If the inmate's request is denied; if the inmate is dissatisfied with the Warden's response; or if there is no response from the Warden within twenty (20) days, the inmate may file an appeal with the appropriate Regional Office Regional Office for the geographic region in which the inmate's institution of confinement is located,[6] using the appropriate form (a BP-10), within twenty (20) calendar days of the Warden's response or the date the response would have been due.[7] Title 28 C.F.R. §§542.18; 542.15(a). If the Regional Office denies relief, the inmate completes the administrative remedy process by appealing the decision to the Office of General Counsel, or the "Central Office," in Washington, D.C., using the appropriate form (a BP-11), within thirty (30) calendar days of the date the Regional Director signed the response. Id. The General Counsel's written response to the inmate's appeal is the final decision of the administrative remedy process, and an inmate is not deemed to have fully exhausted his or her administrative remedies until the request has been filed and acted upon at all the required agency levels. Id.

Within the BOP record-keeping system, each administrative remedy request is assigned a six-digit numerical ID, or case number, as well as an alpha-numeric suffix. The administrative remedy number identifies at what level the remedy was filed; the alpha-numeric suffix identifies the number of times it was filed at that specific level in the administrative review process. Thus, the suffix "F" identifies a remedy request at the institutional (the facility) level, while the letter "R" represents the Regional Office level, and the letter "A" indicates the General Counsel, or the Central Office level. For each specific remedy request, the numerical ID, or case number,

---

[6] For inmates confined at FCI Gilmer, those appeals are sent to the Mid-Atlantic Regional Director in Annapolis Junction, Maryland.

[7] If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level. § 542.18

remains the same, while the alpha-numeric suffix may change, depending upon the progression

of the request through the various levels of administrative review. Furthermore, at each level, the

letter is followed by a number, for example, "F1," which indicates the inmate has filed once at

the institutional level. If the inmate is rejected at that level and refiles the appeal at that same

level, the suffix would be "F2."[8]

Here, the plaintiff's court-approved form complaint alleges that he filed multiple

administrative remedies at FCI Gilmer over his second-hand smoke exposure, to no avail:

> Level 1 - BP-8 – said they were allowed to smoke inside the facility[.]
>
> Level 2 – BP-9 – no response, it went missing. Rewrote BP-8[.]
>
> Level 3 – Rewrote BP-9 no response always missing. BP-10, BP-11 will not responde [sic] without BP-8, BP-9 attach, can't get BP-8 or 9.

Dkt.# 5 at 5.[9]

> Plaintiff did attach a copy of a September 26, 2012 BP-8,[10] complaining that:
>
> Mr. Creasy has shown Prejudice, Indifference, Bias, and Retaliation against me, for using my Const. Right to the Admin. Remedy Process. I have turn in [sic] 5 BP-9s to Mr. Creasy in the month of June and July, on the subjects of: cigarette smoke, inadequate [copy ends; continuation page begins] care from medical for my illness due to cigarette smoke, rewrites on these 2 subjects, and on the Indigent System here at Gilmer for Indigent Inmates. I have personally handed all 5 of these BP-9s to Mr. Creasy and not one of them has been responded to.
>
> Relief Requested: To find my BP-9s and have them responded to. To find out if Mr. Creasy even turn them in or just threw them away.

Dkt.# 5-3 and Dkt.# 5 at 6.

---

[8] See generally, Declaration of Sharon Wahl, Dkt.# 30-2, ¶15 at 2.

[9] Attached to his court-approved form complaint, plaintiff provided one Medical/Dental Sick Call Triage Form and a copy of a September 26, 2012 Request for Administrative Remedy Informal Resolution Form (BP-8), stating "I only have some of my copies that they did not find when putting me in SHU." Dkt.# 5-2 and Dkt.# 5-3.

[10] The Informal Resolution was signed on September 26, 2012, by plaintiff, a staff member, and a Unit Manager. The only legible signature is plaintiff's.

Plaintiff avers that he cannot prove exhaustion because " . . . all BP-8s, BP-9s I wrote went missing and never return [sic] to me. This made the administrative process unavailable to me. . . They also took my pad with names, dates of all officers smoking I had." Dkt.# 5 at 7.

Plaintiff's complaint alleges that defendant Creasy, his former counselor at FCI Gilmer, interfered with his filing of administrative remedies. Defendant Creasy, provided a sworn declaration, averring that while he recalls plaintiff being assigned to his caseload and having filed "several administrative remedies on various issues at FCI Gilmer," he never denied plaintiff's access to the administrative remedy process or destroyed any remedies plaintiff may have filed.[11]

The defendants contend that plaintiff filed only two administrative remedies regarding his FCI Gilmer second-hand smoke exposure and request for a transfer away from FCI Gilmer to escape it. Defendants aver that the first one, Remedy No. 700845-F1, was filed at the institutional level on August 14, 2012,[12] but not denied there until January 10, 2013. Defendants report that plaintiff appealed the denial to the Regional Office level on February 25, 2013, where it was rejected for having an improper number of continuation pages; plaintiff was advised that he could resubmit his appeal in proper form within ten days, but apparently never did.[13] Defendants contend that plaintiff filed a second grievance at the institutional level, alleging the

---

[11] See Declaration of Wiley Creasey, Dkt.# 30-6 at 1.

[12] However, attached to defendants' dispositive motion is a copy of plaintiff's original July 10, 2012 BP-8, on the issue, complaining of the staff's second-hand smoke and requesting a transfer to a medical facility (Dkt.# 30-3 at 38 – 39); the defendants' July 12, 2012 response (Dkt.# 30-3 at 40); and its BP-9, Request for Administrative Remedy No. 700845-F1, filed on July 12, 2012, wherein plaintiff complains of the effects of the second-hand smoke on his health and lists the BOP Program Statements the defendants were violating. (Dkt.# 30-3 at 36 – 37).

[13] See Declaration of Sharon Wahl, Dkt# 30-2, ¶8 - 11 at 2.

same issue, also on August 14, 2012; it was reportedly rejected the same day as being repetitive to the first.[14]

Plaintiff's amended <u>Roseboro</u> response, reproduced here in pertinent part, expounds on the issue in greater detail:

> I filed the BP-9 on 8-19-12 and response was due on 9-3-12 (20 days according to BOP policy), after 27 days 9-10-12 I filed a BP-10 to the region because the PLRA exhaustion of Administrative Remedies (42 U.S.C. §1997e(A) [sic]: If staff fail to respond within the time levels established in the grievance system's rules, the prisoner must appeal to the next stage[)]. I filed my BP-10 and receive a rejection notice from the Mid-Atlantic Region office stating I did not send the BP-9, BP-8, and their response. I receive the rejection notice on or around 9-21-12, and refiled 3 days later with the notice of the warden's failure to respond, I got no response from the region. On or around 11-5-12 I filed a BP-11 with the General Counsel office in Washington, D.C. who also sent me a rejection notice around 11-20-12, I resubmitted 6 to 7 days later, with the notice of no response at the last 2 levels, and PLRA statement, I got no response from D.C.
>
> It was surprising that these rejection notices survive the first losing of some of my property as I was ship [sic] from FCI Gilmer to FCI Coleman, along with a few other missed documents, that 2 weeks before filing their motion to dismiss, I was put in SHU for filing a BP-8, (not for violating a rule or policy, or for any disciplinary reason), and mysteriously [sic] this time all my property, every single piece of paper and property I own (which I was allowed by unit officer to pack myself, and followed me to the SHU the same day) vanish into thin air. This was to keep me from proving I went thru [sic] and finish [sic] the administrative process. The Court can see from document (exhibit A of this response)[15] FCI Coleman admits to the lost [sic] of my legal documents . . . An administrative remedy is not considered to have been available if a prisoner, through no fault of his own was prevented from availing himself of it. I cannot present my copies of my filed BP-8, 9, 10, 11 or the rejection notices from the Mid-Atlantic Region, or the General Counsel Office, because I have no documents at all the BOP has mysteriously [sic] lost them all, forcing and [sic] uneven playing field where I can't fight back. So I quote People v. Handy, NY No. 35 [sic] 3-28-13: The Court Adopted a "missing evidence rule" for cases that require the defendant to prove

---

[14] <u>See</u> Declaration of Sharon Wahl, Dkt# 30-2, ¶12 - 13 at 2.

[15] Exhibit A to plaintiff's response is a May 22, 2013 letter from "R. Martin, Unit Manager" at FCI Coleman, addressed to "To Whom it May Concern," stating in pertinent part: "[p]lease allow an extension of time to inmate Conrad to file paperwork related to the enclosed legal documents. Inmate Conrad was in the Special Housing Unit until May 8, 2013. **It has been verified that legal documentation in his property was misplaced and we are still attempting to locate it.** Please allow him ample time to file his paperwork based upon this fact." Dkt.# 45-1 (emphasis added).

only that he made a dilligent [sic] request and that the evidence was reasonably likely to be material, not that the evidence was destroyed in bad faith.

I direct the Court's attention back to [defendants'] attachment D[16] and the defendants [sic] response to remedy ID No. 700845-F1 its dated 1-10-13, at that date, I was still at FCI Gilmer, and all BP-9 when given to the inmate is sign for in a log book, ask the defendants to produce the log book with my signature for remedy ID No. 700845-F1, - they must keep all administrative logs for at least 1 year and a year has not past. [sic]. The first time I saw this response was upon receiving this motion from the defendants. I direct the court's attention to [defendants'] attachment D, pg. 18 – this is the same BP-9, stating that I filed it 2-25-13 (it has the same ID No. 700845-F1) [sic],[17] but at that time I was already at FCI Coleman, and I never filed anything since filing a BP-11 on or around 11-28-12 on smoking, this is a false entry into record to this Honorable Court. If they put in false entry [sic], they can take out true entry or leave it out. I (inmates) have no constitutional rights to the grievance procedure, and there is no penalty, punishment, or any actionable steps a inmate [sic] can take if the BOP does not process, file, or respond to the administrative remedy they file, but the Court holds us accountable to a procedural process that we have no procedural rights in, "zero, none" and there is no accountability on the side of the BOP, (where is the fairness in this procedure). There can never be a duty without a right (E. Allen Fainworth, Contracts §3, 4 at 114, n3 3rd Ed. 1999). I have completed the administrative remedy process, but the lost [sic] of all my papers, documents, and legal work by the BOP has stop me [sic] from proving so.

Dkt.# 45 at 1 – 2.

Despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements . . . ," see Booth v. Churner, 532 U.S. at 741, n. 6, several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. See Mitchell v. Horn, 318 F.3d 523, 529 (3rd Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Ziemba v. Wezner, 366 F.3d 161 (2nd Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense, where the defendant's actions render

---

[16] Attachment D of defendants' response is a copy of a computerized printout summarizing the administrative remedies plaintiff filed, titled Administrative Remedy Generalized Retrieval. Dkt.# 30-3 at 14 – 34.

[17] The number for the administrate remedy plaintiff refers to is actually 700845-R1, not 700845-F1. The alpha-numeric suffix "R1" indicates that it is the same Administrative Remedy No. 700845-F1, which plaintiff apparently appealed to the Regional Office after it was denied at the institutional level.

the grievance procedure unavailable); <u>Aceves v. Swanson</u>, 75 Fed. Appx. 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request); <u>Miller v. Norris</u>, 247 F.3d 736, 740 (8th Cir. 2001)(a remedy is not available within the meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); <u>Dotson v. Allen</u>, 2006 WL 2945967 (S.D. Ga. Oct. 13, 2006)(dismissal for failure to exhaust not appropriate where plaintiff argues that failure to exhaust was direct result of prison official's failure to provide him with the necessary appeal forms).

Here, plaintiff contends he filed multiple BP-8s, 9s, 10s, and 11s in June and July, 2012, regarding his second-hand smoke exposure, without receiving responses. He avers that he attempted to appeal them but his attempts were rejected or denied because he did not attach copies of the underlying BP-8s or BP-9s, because they were never responded to, and thus, never returned to him. He contends he re-wrote and resubmitted them, but they always "went missing" and he did not receive responses.[18] He argues that the defendants, after making him pack up his own belongings, including all copies of his administrative remedies and legal papers, then confiscated all of them when they put him in FCI Gilmer's SHU. When he finally arrived at FCI Coleman, the copies of his administrative remedies and legal papers were not among the rest of his belongings, and they have never been located. He attaches a letter, noted *supra* at n.13 on page 12, from his counselor at FCI Coleman, confirming this.

Although defendants contend plaintiff only filed two grievances requesting transfer because of second-hand smoke exposure, the Administrative Remedy Generalized Retrieval printout attached to their response, purporting to show *all* administrative remedies filed by

---

[18] Plaintiff appears to misconstrue the date of February 25, 2013, on the response to Remedy No. 700845-R1 (Dkt.# 30-3 at 30), as evidence of the defendants' tampering with his administrative remedy records. It is apparent from that remedy's alpha-numeric suffix that it is the same administrative remedy plaintiff allegedly filed on August 14, 2012, now being appealed to the Regional Level.

plaintiff, does not show that any remedies were filed in June or July, 2012 regarding the second-hand smoke issue. Defendants contend that the first one plaintiff ever filed on the issue was Remedy No. 700845-F1, filed on August 14, 2012.[19] Because the BOP's administrative remedy process requires a response to a BP-9 filed at the institutional level within 20 days, the Warden's response to plaintiff would have been forthcoming by September 3, 2012. Nonetheless, defendants admit plaintiff did not receive a response until January 10, 2013, well over four months later.[20] Inexplicably, the defendants attached a copy of their response to the original BP-8 for this remedy, indicating that plaintiff filed the BP-8 on July 10, 2012; it was denied on July 12, 2012; and the plaintiff submitted a BP-9 for that administrative remedy the same day. Because the BOP's administrative remedy process requires a response to a BP-9 filed at the institutional level within 20 days, the Warden's response to plaintiff's July 12, 2012 BP-9, *also* with the ID# of Remedy No. 700845-F1, should have been forthcoming by August 1, 2012. Defendants' response does not explain this discrepancy.

The copy of the computerized printout Administrative Remedy Generalized Retrieval, provided by defendants, also shows that the plaintiff filed another Administrative Remedy, No. 708396-F1, on October 12, 2012, for the reason "wants transferred."[21] It was apparently rejected for not being written in pen or typed as per instructions.[22] Another Administrative Remedy, No. 708396-F2 was filed the same day, again requesting a transfer without specifying the reason for it; it is not apparent whether the request for transfer was related to the second-hand smoke

---

[19] Declaration of Sharon Wahl, Dkt.# 30-2, ¶8 at 2, and Dkt.# 30-3 at 35. Defendants contend plaintiff appealed its denial to the Regional Office level on February 25, 2013, where it was rejected for having an improper number of continuation pages and plaintiff was advised that he could resubmit it in proper form within ten days but never did.

[20] The defendants' response is completely silent as to the reason for this inordinate delay.

[21] Dkt.# 30-3 at 27. There is no mention of the reason plaintiff requested the transfer, so it is unclear whether it was related to the second-hand smoke exposure.

[22] Dkt.# 30-3 at 27.

exposure. The remedy was "closed" on January 9, 2013, not rejected, granted, or denied, for reasons that are unclear.[23] There is no record in the printout of its being appealed.

After a careful review of the record, and construing the facts available at present in the light most favorable to the nonmoving party, the undersigned finds that there is a genuine issue of material fact, sufficient to deny defendants' motion for summary judgment based on plaintiff's failure to exhaust his administrative remedies. While it appears from the record that plaintiff may indeed have failed to fully exhaust Administrative Remedy No. 700845-F1, by re-submitting it in proper form after it was rejected for having too many attached pages, questions still remain as to the discrepancies in the filing dates; ambiguities in the records of the October 12, 2012 remedies filed over the requests for transfer; and whether, in fact, the defendants did interfere with the filing of the administrative remedies plaintiff contends he filed in June and July, 2012. Accordingly, plaintiff's claims should be given full review.

**B.   Conditions of Confinement: Plaintiff's Second Hand Smoke Exposure**

Plaintiff alleges that he, and inmates like himself were continually exposed to the second-hand smoke by the FCI Gilmer employees who smoked on the job while manning the guard booths or taking breaks, in violation of BOP Program Statement §551.160.  Plaintiff contends that his Eight Amendment rights were violated when he was required to walk through clouds of second-hand smoke three - four times daily, whenever he entered or exited, *en route* to medical, meals, or recreation; and that it caused him health problems, such as headaches; sinus problems; dizziness, shortness of breath; nausea, vomiting, loss of appetite, a weight loss of twenty pounds; and "stress problems" from worry about developing cancer.   He contends that he either could

---

[23] Dkt.# 30-3 at 28.

not eat, or vomited what he had already eaten, when he was forced to walk back through the smoke before and after meals.

In general, the Eighth Amendment prohibits "cruel and unusual punishment." <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994). The cruel and unusual punishment clause of the Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. <u>See</u> <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991). To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991).

To prevail on a conditions-of-confinement claim, only extreme deprivations satisfy the objective component. Plaintiff must either demonstrate that he sustained a serious or significant physical or emotional injury, or a substantial risk of serious harm resulting from the challenged conditions. <u>See</u> <u>Shakka v. Smith</u>, 71 F. 3d 162, 166 (4th Cir. 1995)(internal citations omitted).

Here, plaintiff is alleging both present harm resulting from his exposure and a substantial risk of serious future harm. Courts have differentiated between cases alleging present harm and those alleging future harm from second-hand smoke exposure. <u>See</u> <u>Colon v. Sawyer</u>, 2006 WL 721763 *7 (N.D.N.Y. Mar. 20, 2006).

Plaintiff's claim of danger to his present health from second-hand smoke exposure is governed by the same standard as any other Eighth Amendment claim of deliberate indifference to serious medical needs. <u>See</u> <u>Colon</u>, 2006 WL 721763 (citing <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976)). In order to state a claim under the objective prong of the <u>Farmer</u> test for present injury caused by second hand smoke exposure, a plaintiff must show that the exposure caused him to

suffer serious adverse health consequences. Id. What suffices as a serious medical need is one that "is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." Martin v. Bowman, 1995 WL 82444, *3 (4th Cir. Feb. 24, 1995) (quoting Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990)). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[24] The Fourth Circuit, however, has taken the analysis one step further by requiring not only that the condition be serious, but also that a prisoner provide evidence that his condition was not timely or properly treated. Harden v. Green, 2001 WL 1464468, *3 (4th Cir. Nov. 19, 2001) ("The objective element also requires [the prisoner] to prove that his serious medical need was not timely or properly treated); Clinkscales v. Pamlico Correctional Facility Medical Dept., 2000 WL 1726592, *1 (4th Cir. Nov. 21, 2000).

An analysis of plaintiff's second-hand smoke exposure must begin with a careful review of plaintiff's BOP housing records to determine the length of his possible exposure. Those records, attached to the defendants' response, indicate that while plaintiff was incarcerated at FCI Gilmer for 7 ½ months,[25] he was placed in the Special Housing Unit ("SHU") on September 11, 2012 and remained there for 3 months and one week, until he was transferred to FCI

---

[24] A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W.Va. 1995). And arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008).

[25] Plaintiff was housed at FCI Gilmer from June 5, 2012 until January 16, 2013. See Inmate History Quarters, Dkt.# 30-3 at 43 – 46.

Coleman.[26]  Defendants aver that inmates in the SHU are kept in their cells for approximately 23 hours per day, and that there is no smoking inside any building within the prison, including the Special Housing Unit;[27] plaintiff does not deny this and nowhere alleges that any smoking ever occurred indoors.  Accordingly, while it is apparent from the record that it is likely plaintiff was in fact intermittently and briefly exposed to outdoor second hand smoke at FCI Gilmer during scheduled inmate movement, because of the length of his confinement in the SHU, his exposure could not have been for more than 3 months and one week of the 7½ months he was incarcerated at FCI Gilmer.

Plaintiff has failed to demonstrate a serious medical need or a serious adverse health consequence from his alleged exposure to second-hand smoke at FCI Gilmer.  His allegations of dizziness, headaches, nausea, shortness of breath, and loss of appetite; sinus problems; a 20-pound weight loss; severe headaches; and stress from worrying about the risk of developing cancer[28] are unsupported by his BOP medical  records.  Further, he cannot show that any of these alleged symptoms mandated treatment,[29] let alone that they were caused by his brief, intermittent exposure to second-hand smoke while walking outdoors through the compound 3-4 times a day for several months. In other cases alleging second-hand smoke exposure, courts have rejected Eighth Amendment claims based on the onset or aggravation of pre-existing asthma, a condition much more serious than the symptoms plaintiff alleges here. See Oliver v. Deen, 77 F.3d 156, 159-60 (7th Cir. 1996); Blyden v. Bartlett, 1997 WL 584308, *2 (W.D.N.Y. Sept. 9, 1997).

---

[26] Id.

[27] See BOP Program Statement 1640.04, Smoking/No Smoking Areas, and Attachment B, Gilmer Institution Supplement GIL-1640.04, Smoking/Non-Smoking, Dkt.# 30-3 at 1-8 and 30-3 at 9-12.

[28] Id.

[29] See Martin, 1995 WL 82444, *3.

As for plaintiff's claim of future harm from the potential for developing cancer from exposure to second-hand smoke, clearly, the long "lag time" between exposure to a toxin and development of cancer makes it particularly difficult to evaluate such a link.[30] The appropriate standard for cases such as this one is set forth in Helling v. McKinney, 509 U.S. 25 (1993), a second-hand smoke exposure case. Helling was an inmate assigned to a cell with another inmate who smoked 5 packs of cigarettes daily.[31] In finding that Helling stated a valid cause of action, "the Court impliedly found that exposure to such amounts of environmental tobacco smoke could be found to be unreasonably high." Mills v. Clark, 2000 WL 1250781 at * 3 (4th Cir. Sept. 5, 2000). The Helling Supreme Court held that a plaintiff "states a cause of action under the Eighth Amendment by alleging that . . . [the defendants] have, with deliberate indifference, exposed him to levels of . . . [environmental tobacco smoke] that pose an unreasonable risk of serious damage to his future health." Helling, supra at 35. The exposure element is the "objective element." Id. Determining whether second-hand smoke exposure is sufficient to violate the Eighth Amendment requires "more than a statistical inquiring into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure" to second-hand smoke. Id. at 36. It also requires an assessment of whether "society considers the risk . . . so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id.

Thus, Helling establishes a constitutional right to be free from a level of second-hand smoke that is so high that it poses an unreasonable risk of serious damage to future health.

---

[30] The United States Environmental Protection Agency's Toxic Release Inventory (TRI) data are frequently used to estimate a community's exposure to pollution. Lung cancer age-adjusted mortality rates from the National Cancer Institute's Surveillance Epidemiology and End Results (SEER) database from the years 1990 through 2006 inclusive and from 1987 to 1996 reflect a lag time between chronic exposure to toxic chemicals and the development of lung cancer. See http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3070612/

[31] See Id. at 28.

Helling also requires that a plaintiff show he has not only been exposed to such unreasonably high levels of smoke, but also that such exposure is contrary to current standards of decency for anyone to be so exposed, and that today's society will not tolerate such exposure.[32]

As for the subjective element, deliberate indifference, it must be determined in light of the prison authorities' current attitudes and conduct." Helling, *supra* at 36. Whether a defendant has adopted a smoking policy bears heavily on the deliberate indifference inquiry. Id. While the Helling court went no further in defining what constitutes an unreasonably high level of second-hand smoke exposure, the Fourth Circuit has held that a prison official may be unaware that a prisoner's current exposure amounts to an unreasonably high level and, therefore, qualified immunity will continue to protect prison officials who make discretionary decisions in situations where a prisoner's exposure to second-hand smoke is not clearly unreasonably high.[33]

Here, it is apparent from the record that plaintiff's second hand smoke exposure can only have been, at most, for intermittent, brief periods, 3-4 times daily during a thirteen week period, while passing through outdoor areas on FCI Gilmer's compound, where smoke would easily disperse into the atmosphere. This is far short of the threshold standard required by Helling, where the plaintiff was forced to breathe the second-hand smoke of 5 packs of cigarettes daily in a confined space. Plaintiff was never exposed to an amount of smoke "contrary to current standards of decency."[34]

Plaintiff's case does not even rise to the level of that in Colon v. Sawyer, where the Court found that the inmate's allegations that he was housed in a smoking dormitory and was subjected to second-hand smoke near the dining hall entrance and exit, "fall far short of satisfying the

---

[32] Mills v. Clark, 2000 WL 1250781 * 3 (4th Cir. Sept. 5, 2000) (per curiam) (quoting Helling, 509 U.S. at 35-36).

[33] Id.

[34] See e.g., Mills, 2000 WL 1250781 at * 3 (level of second hand smoke in prison dormitory with computerized ventilation system did not violate rights under Helling).

objective prong of the <u>Farmer</u> test." <u>Colon</u>, 2006 WL 721763 *9 (N.D.N.Y. Mar. 20, 2006).

Similarly, in <u>Mills</u>, the Fourth Circuit held that "exposure to environmental tobacco smoke once

a week for only one hour does not, on its face, rise to the level of unreasonably high exposure

required by <u>Helling</u>." <u>Mills</u>, *supra* at *5. The Court further noted that "[i]t is common knowledge

that such a level of second hand smoke is present at some time in some part of almost every

restaurant in the United States." <u>Id</u>. Plaintiff was exposed to no more second-hand smoke than

would any citizen on the street be, who walks past smoking patrons standing outside of

restaurants, stores or office buildings.

Finally, plaintiff cannot meet his burden of showing of the potential for serious harm or

the likelihood that a prospective injury to his health will occur. His brief, intermittent thirteen-

week second-hand smoke exposure was always diluted by fresh air, and he was transferred from

FCI Gilmer on January 16, 2013;[35] thus, he cannot show a likelihood of facing significant future

harm because his exposure was so   dilute and limited and he is no longer exposed.  In claims

invoking a substantial risk of future harm, the subjective component "should be determined in

light of the prison authorities' current attitudes and conduct. . . ." <u>Helling</u>, *supra* at 36. In

addition, a plaintiff:

> [M]ust come forward with evidence from which it can be inferred that the
> defendant-officials were at the time suit was filed, and are at the time of summary
> judgment, knowingly and unreasonably disregarding an objectively intolerable
> risk of harm, and that they will continue to do so; and finally to establish
> eligibility for an injunction, the inmate must demonstrate the continuance of that
> disregard during the remainder of the litigation and into the future.

<u>See</u> <u>Farmer</u>, 511 U.S. at 845-46.

Here, defendants aver that FCI Gilmer already had a policy in place to permit staff's

smoking only in designated areas, during the entire time plaintiff was incarcerated there, and that

---

[35] <u>See</u> Declaration of Sharon Wahl, Dkt.# 30-2,¶6 at 1, and Inmate History Quarters, Dkt.# 30-3 at 43 – 46.

those areas were (1) out of bounds to inmates; and (2) a minimum of the required 25 feet away from entrances or exits of buildings.[36] Further, staff received periodic reminders about utilizing the smoking areas,[37] including a November 8, 2012, email by Warden Perdue, directing staff to cease smoking in the center of the compound during inmate movement.[38] It is apparent that the defendants were never deliberately indifferent to enforcing the smoking policies at FCI Gilmer, and thus this claim should be dismissed.

## C.  Deliberate Indifference to Serious Medical Needs

Plaintiff alleges that the defendants refused him medical attention for the health issues caused by second hand smoke exposure, telling him he was "wasting $2 coming to them;" that there was nothing they could do for him; and that he should "go to commissary and buy some Tylenol" and stop wasting their time.

To state a claim under the Eighth Amendment for ineffective medical assistance, the same standards apply as noted *supra,* in the analysis of plaintiff's conditions of confinement claim.  A cognizable claim under the Eighth Amendment is not raised when the allegations reflect a mere disagreement between the inmate and a physician over the inmate's proper medical care, unless exceptional circumstances are alleged.  Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

Here, plaintiff's claim of second-hand smoke exposure-related health problems of headaches: sinus problems; dizziness; shortness of breath; nausea and vomiting with loss of appetite and a 20-pound weight loss; and "stress problems" from worry about developing cancer

---

[36] See Declaration of Sharon Wahl, Dkt.# 30-2; BOP Institution Supplement No. GIL-1640-04A, Dkt.# 30-3 at 9; and Declaration of Wiley Creasey, Dkt.# 30-6.

[37] BOP Institution Supplement No. GIL-1640-04A, Dkt.# 30-3 at 9.

[38] See April 2, 2013 email, redacted, Dkt.# 30-3 at 13.

have no support in his medical records. To the contrary, a careful review of plaintiff's medical records from his time at FCI Gilmer up to the present reveals no serious adverse health consequences at all, as a result of second-hand smoke exposure.

On March 2, 2012, three months before being transferred to FCI Gilmer, plaintiff's BOP Health Problems list indicates he was treated for headaches.[39]

On May 7, 2012, one month before being transferred to FCI Gilmer, petitioner submitted an inmate request to staff regarding "medical," complaining of pain in his left leg for 19 years, pain in both feet for 4 years, and headaches for 2 months.[40]

On June 5, 2012, plaintiff was transferred in to FCI Gilmer. At a BOP Health Services Clinical Encounter that day, he denied any respiratory problems or history of weight loss. His weight was not recorded. He was given arch supports and medical shoes.[41]

On June 11, 2012, plaintiff submitted an inmate request to staff for "medical," complaining of headaches, dizziness, stomach aches and "extreme pain for 7 days." The following day, he was advised to follow up at the next Chronic Care Clinic.[42]

Petitioner was seen in Chronic Care Clinic on June 13, 2012, appearing well but complaining of low back pain, bilateral foot pain, bone spurs, flat feet,[43] and benign prostatic hypertrophy. His lungs were clear and he made no complaint of symptoms related to second-hand smoke exposure. Tylenol and Meloxicam, an NSAID, were prescribed for his pain and he

---

[39] Dkt.# 30-5 at 21.

[40] Dkt.# 43-1 at 7.

[41] Dkt.# 30-4 at 63 - 66.

[42] Dkt.# 43-1 at 11.

[43] Plaintiff's BOP medical records indicate he was prescribed shoe inserts, medical shoes, and arch supports. Dkt.# 30-5 at 14. Elsewhere in the records there are notations on September 25, 2008 and March 7, 2011 that plaintiff's claims of left leg pain had had "no physical findings for years . . . probably malingering – he was selling medical shoes we gave him at one point[.]" Dkt.# 30-5 at 20.

was given a prescription for his prostate problem.  Laboratory tests were ordered and he was instructed to return as needed.[44]

On June 18, 2012, he submitted another inmate request to staff for "medical," complaining of headaches; shortness of breath; dizziness; and bleeding in his ear for 9 days. He did not allege that any of his symptoms were related to second-hand smoke exposure.  The following day, he was advised to follow up at the next chronic care clinic. [45]

On July 3, 2012, he went to sick call for sores in his mouth; pain in his hip; 90-second episodes of dizziness with position changes for the past few weeks; and bleeding without pain in his right ear for 20 days. He was examined by a physician's assistant ("P.A.") and diagnosed with orthostatic hypotension secondary to a recently-increased Doxazosin dose;[46] an abrasion in his right ear canal; and a deformity of his right hand, a "1st finger hammer," from a four-month old injury. Laboratory tests, an EKG, and a right hand x-ray were ordered, and it was noted that hand surgery might be required.[47]  He was advised to follow up at sick call as needed, and at chronic care clinic as scheduled. His Meloxicam[48] dose was increased, per his request.[49] Petitioner appeared well, his lungs were clear; he made no mention of any discomfort related to second-hand smoke exposure, and specifically denied loss of appetite or unexplained weight loss.[50]

---

[44] Dkt.# 30-4 at 54 – 57.

[45] Dkt.# 43-1 at 12.

[46] Doxazosin is the generic name for Cardura, an antihypertensive.

[47] Dkt.# 30-4 at 48 – 50.

[48] Meloxicam is Mobic, a non-steroidal anti-inflammatory ("NSAID").

[49] Dkt.# 43-1 at 13.

[50] Dkt.# 30-4 at 48 – 49.

On July 12, 2012, Plaintiff submitted a sick call/triage form, complaining of the same problems he was seen for on July 3, 2012: pain in hip, dizziness, headache, nausea and shortness of breath; he noted that "[a]ccording to BOP policy, I cannot be charged for co-pay for the same problem if seen in 13 days of the complaint." He was seen by the P.A, and when asked how long he had had the problem, he reported "30 days." When asked if anything relieved the problem, he replied "I don't know, wasn't given anything." When asked if anything made it worse, he replied "Smoke." He complained that he "gets headaches b/c [correctional officers] smoke near him." He was advised to avoid smoke and was referred to the commissary to purchase over-the-counter Ibuprofen.[51]  Plaintiff never made any other complaint of symptoms related to second-hand smoke exposure to Health Services while at FCI Gilmer.

On September 11, 2012, he was placed in the SHU, ending any possible exposure to second-hand smoke at FCI Gilmer. At a BOP Health Services Clinical Encounter for "Injury Assessment – Not Work Related" that day, he denied any injury and reported no symptom related to prior second-hand smoke exposure.[52]

On September 19, 2012, plaintiff was prescribed over-the-counter chlorpheniramine[53] tablets and simethicone, presumably for gas.[54]

At an October 17, 2012 BOP Health Services Clinical Encounter, his amitriptyline was discontinued[55] for "gross pill line noncompliance."[56]

---

[51] Dkt.# 43-1 at 14.

[52] Dkt.# 30-4 at 45.

[53] Chlorpheniramine is an antihistamine used to treat allergy symptoms.

[54] Dkt.# 30-4 at 28.

[55] Despite petitioner's having  had a regular prescription for daily amitriptyline (Elavil, an antidepressant) at bedtime prescribed "for pain," beginning at least as early as April 30, 2012 (See Dkt.# 30-5 at 32), a serum drug screen performed on October 4, 2012, failed to detect any amitriptyline in his blood. Dkt.# 43-1 at 4.

On November 14, 2012, two months after being placed in the SHU, plaintiff submitted a sick call triage form, reporting pain and passing blood in his stool since September 29, 2012.[57] On November 19, 2012, at a BOP Health Services Clinical Encounter, he again reported having rectal pain and bleeding after defecation, now reporting the problem had been only been present for the past 2-3 weeks. He also reported 1st finger pain from a remote trauma and pain in multiple other locations. His Meloxicam was discontinued.[58] A colonoscopy consult was requested; an appointment was made with a hand specialist for the finger injury. He specifically denied loss of appetite or unexplained weight loss, cough, dyspnea, on exertion or otherwise, or coughing up blood.[59]

On December 10, 2012, plaintiff was seen in the SHU for a chronic care orthopedic/rheumatology visit. He reported anal pain with a "tearing" sensation at times; and requested a saline nasal spray, not available in the SHU commissary.[60] He did not attribute the need for nasal spray to any second-hand smoke exposure. It was noted that he had pending consults for both a hand specialist and general surgery for a colonoscopy and laboratory blood work pending collection.[61] Further, it was noted he had **no** constitutional symptoms such as loss

---

[56] Dkt.# 30-4 at 43.

[57] Dkt.# 43-1 at 9.

[58] Plaintiff had an old left leg injury and had chronic pain from 3 surgeries to repair it; he took an NSAID, Meloxicam, to relieve it. The Meloxicam was later discontinued as the suspected cause of the rectal bleeding. See BOP Health Records, Dkt.# 30-4 at 17.

[59] Dkt.# 30-4 at 37.

[60] On December 10, 2012, three months after being placed in the SHU where there was no possibility of second-hand smoke exposure, plaintiff was prescribed Cromolyn 4% Nasal Spray, an antihistamine, for the first time, presumably for his "allergic rhinitis, cause unspecified." Dkt.# 30-4 at 34 - 35.

[61] Dkt.# 30-4 at 32.

of appetite or unexplained weight loss, nor any pulmonary symptoms of cough, dyspnea, on exertion or otherwise, coughing up blood or dizziness.[62]

On December 19, 2012, over three months after being placed in the SHU, away from any possibility of second-hand-smoke exposure, plaintiff presented for a BOP Health Services Inmate Intra-system transfer evaluation. His health problem list included "allergic rhinitis, cause unspecified." There was no mention of headache; dizziness; shortness of breath; stress over worry about developing cancer; loss of appetite; nausea and vomiting; or weight loss.[63]

On January 7, 2013, plaintiff was seen in a BOP Health Services Clinical Encounter to evaluate him for transfer; it was noted that he needed blood work done for his impending transport.[64]

On January 10, 2013, in a BOP Health Services mental health Clinical Encounter, it was noted that plaintiff had some "ongoing nasal congestion" along with "twitching of muscles (worried he's getting what Michael J Fox has)," which was thought to be psychosomatic.[65] His allergic rhinitis was noted, "cause unspecified."[66]

Plaintiff was transferred to FCI Coleman on January 16, 2013.[67]

On January 23, 2013, plaintiff was seen in Health Services at FCI Coleman. He denied any respiratory problems or weight loss. He was given new arch supports and medical shoes.[68]

---

[62] Id.

[63] Dkt.# 30-4 at 74 - 75.

[64] Dkt.# 30-4 at 30.

[65] Dkt.#30-4 at 26 and 28.

[66] Dkt.# 30-4 at 27.

[67] Dkt.# 30-3 at 43-46.

[68] Dkt.# 30-4 at 58 – 61.

On January 25, 2013, plaintiff's nasal spray prescription was changed to Flunisolide Nasal (Nasalide).[69]

On January 30, 2013, at FCI Coleman Health Services, plaintiff provided a detailed medical history to the physician but made no mention of any health issues related to second-hand smoke exposure.[70]

On March 14, 2013, plaintiff was seen in sick call at FCI Coleman. He reported headaches; right foot pain; joint pain; muscle aches; weakness and stiffness. He also reported dizziness, for which he was given a 30-day prescription of Meclizine.[71]

On March 21, 2013, plaintiff was seen in sick call at FCI Coleman for symptoms of an acute upper respiratory infection: nasal congestion; sore throat; body aches; and a productive cough for the previous few days. He also reported pain in multiple locations. He had no fever.[72] He was prescribed an antibiotic and Nasalide nasal spray.[73]

On May 3, 2013, plaintiff was seen at FCI Coleman's sick call for a sinus problem and a skin outbreak.[74]

On May 4, 2013, he was medically evaluated in the FCI Coleman SHU, appeared well but reported feeling fatigued and weak and being on a hunger strike.[75] He had no pulmonary symptoms and made no complaints of second-hand smoke exposure.[76]

---

[69] Dkt.# 30-5 at 33.

[70] Id.

[71] Dkt.# 30-4 at 10 - 11.

[72] Dkt.# 30-4 at 8 – 9.

[73] Nasalide is an anti-inflammatory glucocorticosteroid used to treat allergic rhinitis.

[74] Dkt# 30-4 at 7.

[75] At that time, his weight was found to be 178.2#. Dkt.# 30-4 at 1 – 2.

On May 5, 2013, the last day included in the plaintiff's BOP medical records, he was still on the hunger strike and his condition was unchanged. He did not report any symptoms attributable to second-hand smoke exposure.[77]

Despite plaintiff's insistence that his second-hand smoke exposure necessitated the prescribing of Meclizine for dizziness, nausea and vomiting,[78] his records reveal that Meclizine was never even prescribed until March 14, 2013,[79] after plaintiff had already been at FCI Coleman for two months, and six months after he was placed in the SHU at FCI Gilmer, away from any possible second-hand smoke exposure. Moreover, the Meclizine prescription was for only one month duration,[80] and was probably related to the acute upper respiratory infection he developed a few days later. Plaintiff also insists that he required an albuterol inhaler to relieve "wheezing, shortness of breath, coughing and chest tightness," and Benzonate to relieve cough.[81] There is no record of him ever complaining of wheezing, shortness of breath, or chest tightness while at FCI Gilmer or FCI Coleman; nor any record of either medication ever being prescribed to him in his records, either at FCI Gilmer or subsequently, at FCI Coleman. The only time he ever reported a cough to BOP's Health Services at either institution was when he had the acute upper respiratory infection at FCI Coleman in March, 2013.

Further, there is nothing in plaintiff's BOP medical records to support his claim of loss of appetite; nausea; vomiting before or after meals, or any weight loss while at FCI Gilmer, let

---

[76] Dkt.# 30-4 at 4 – 5.

[77] Dkt.# 30-4 at 1 – 3.

[78] See plaintiff's supplemental response to the Roseboro Notice, Dkt.# 45 at 6.

[79] Dkt.# 30-5 at 34.

[80] Id.

[81] See plaintiff's supplemental response to the Roseboro Notice, Dkt.# 45 at 6.

alone a 20-pound weight loss.[82] Although he did report an occasional headache while at FCI Gilmer and once later, at FCI Coleman, it is clear from his records that he already had a history of headaches before ever arriving at FCI Gilmer. Likewise, there is nothing in the records to support his claim of dizziness from second-hand smoke while at FCI Gilmer; the only reports of dizziness while at FCI Gilmer were related to an increase in blood pressure medication.

Accordingly, a review of plaintiff's medical records fails to demonstrate that any of his medical needs were ever not promptly and appropriately treated, or that his second hand smoke exposure caused him to suffer any serious adverse health consequences. The medical records submitted by the defendant demonstrate that the plaintiff was provided regular, continuous and appropriate medical care under the circumstances, and that there was never an intentional interference with a prescribed course of treatment. Therefore, the plaintiff has failed to meet the objective component as required by the Fourth Circuit. Nor can he meet the subjective component. To establish deliberate indifference, the plaintiff must show that prison officials knew of and disregarded a substantial risk to his health.[83] Medical staff may be found to be deliberately indifferent by intentionally denying or delaying access to medical care or by intentionally interfering with a prescribed course of treatment. Estelle, *supra* at 104-05. The record as a whole disputes plaintiff's claims that he was denied medical care by the defendants. Plaintiff's BOP medical records make it clear that plaintiff was seen regularly for multiple health issues: his medications were titrated according to his reports of side effects; new medications were added and others discontinued when appropriate; he was given multiple and prompt

---

[82] Plaintiff's weight was not recorded when he arrived at FCI Gilmer on June 5, 2012; the first time it was recorded at FCI Gilmer was on November 19, 2012, when it was 182#. Dkt.# 30-4 at 38. On December 10, 2012, he weighed 184#, a two-pound weight gain. Dkt.# 30-4 at 33. He was transferred out of FCI Gilmer on January 16, 2013, and at a BOP Clinical Encounter at FCI Coleman on January 23, 2013, he denied any respiratory problems or weight loss. Dkt.# 30-4 at 58. His weight was still 184#. Dkt.# 30-4 at 61.

[83] Farmer v. Brennan, *supra* at 833-34.

accommodations for his particularized needs; he was repeatedly provided with health teaching on a variety of issues; and was repeatedly seen at sick call, in Health Services, and in the SHU, whenever the need arose. Despite the plaintiff's attempt to characterize his claim as one of deliberate indifference, it is clear from the plaintiff's medical records that the defendants have not been indifferent to his needs, deliberate or otherwise.  Rather, it is clear that all of the plaintiff's complaints have been thoroughly, and in the undersigned's opinion, appropriately evaluated and treated.  It appears then, that the plaintiff really takes issue with the type of treatment he received.  In other words, the plaintiff merely disagrees with the prison's medical staff as to his diagnosis or course of treatment. However, such a claim is more appropriately a tort claim and, as already noted, does not rise to the level of a constitutional violation.  Wright v. Collins, *supra.*  Accordingly, the plaintiff has failed to state a claim for which relief may be granted and the defendants are entitled to judgment as a matter of law.

**D.  Warden Perdue**

Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Truloch v. Freeh, 2755 F.2d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, in order to establish liability in a Bivens case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2nd Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown.  See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for violation of a constitutional right in a Bivens case. Rizzo v. Good, 423 U.S. 362 (1976).

Here, the plaintiff asserts no personal involvement by Perdue in the alleged violations of his constitutional rights. Instead, the plaintiff merely asserts that Perdue had supervisory authority over the alleged violators and that he should have done something to prevent the alleged violations of the plaintiff's rights.

In <u>Miltier v. Beorn</u>, 896 F.2d 848, 854 (4th Cir. 1990), the Fourth Circuit recognized that supervisory defendants may be liable in a <u>Bivens</u> action if the plaintiff shows that: "(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations."[84] In so finding, the Court recognized that "[s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury." <u>Id.</u> However, the plaintiff cannot establish supervisory liability merely by showing that a subordinate was deliberately indifferent to his needs. <u>Id.</u> Rather, the plaintiff must show that a supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practice. <u>Id.</u>

In this case, the plaintiff has provided no evidence that defendant Perdue tacitly authorized or was indifferent to an alleged violation of his constitutional rights. To the contrary, while Perdue did deny plaintiff's Administrative Remedy #700845-F1 on January 10, 2013, advising that "smoking occurs in the designated smoking areas within this institution . . . located within the established parameters [] [but that] . . . Smoking inside of buildings by staff or inmates

---

[84] <u>Miltier</u> has been overruled by <u>Farmer</u> to the extent that it allowed a finding of deliberate indifference upon constructive knowledge, but it is still good law for the proposition cited.

is prohibited[],"[85] defendants contend that upon Perdue's arrival at FCI Gilmer, he further restricted the smoking regulations that were already in place. Plaintiff does not dispute this. Defendants' response attaches a copy of an April 2, 2013 email, with the sender's and recipient's names redacted,[86] and the subject line "Fwd: Designated Smoking Area," stating ">>>GIL/AW-Programs ~ 11/8/1012 1:38 PM >>>This is a reminder that smoking is allowed only in designated areas. The patio of the staff lounge is not a designated area. Additionally, staff should no longer smoke in the designated area in the center of the compound **during Inmate** [sic] **movement**." (Dkt# 30-3 at 13)(emphasis in original).

It would appear then, that plaintiff's allegation that FCI Gilmer staff was smoking in non-designated areas is true. However, it also apparent that at least by early November, 2012, defendant Perdue issued a directive to staff make them cease doing so. Thus, it would seem that Perdue, rather than being deliberately indifferent or tacitly authorizing the offensive practice, took affirmative steps to stop it, and to prevent the violation of plaintiff's and other inmates' rights. The fact that Perdue failed to grant the plaintiff relief during the administrative process is irrelevant; it is not the type of personal involvement required to state a <u>Bivens</u> claim. <u>See</u> <u>Paige</u> <u>v. Kupec</u>, 2003 WL 23274357 *1 (D. Md. March 31, 2003). Moreover, defendant Perdue is a Warden, not a medical provider; while plaintiff claims his medical needs were denied, he has not provided any evidence to show it was Perdue denying his requests. The undersigned notes that the Fourth Circuit has held that non-medical personal may rely on the opinion of medical staff regarding the proper treatment of inmates. <u>Miltier</u>, *supra* at 854. Thus, the defendant Perdue was entitled to rely on the opinion of the BOP medical providers as to whether the plaintiff

---

[85] Dkt.# 30-3 at 35.

[86] Defendants admit that the sender was Warden Perdue. <u>See</u> Dkt.# 31 at 16.

actually needed medical care.  Accordingly, the plaintiff cannot maintain a <u>Bivens</u> claim against Warden Perdue.

**E. <u>Defendants Counselor Creasy, Secretary Wilson, and Officer Thrope</u>**

The sum total of plaintiff's allegations against Creasy, Wilson and Thrope in the complaint are that Creasy was "[s]moking in uniform, on the job (Dkt.# 5 at 2); Wilson was "[s]moking on the job, on a break (Dkt.# 5 at 3); and Thrope "was in uniform at the time of her smoking."  (Dkt.# 5 at 3).

Under 28 U.S.C. § 1915(e)(2), the Court must dismiss, at any time, any action proceeding *in forma pauperis* if it determines that the action fails to state a claim on which relief may be granted, or if the action seeks recovery from an individual that is immune. After review of plaintiff's complaint, the Court finds that it must be dismissed as to these defendants, pursuant to § 1915(e)(2). Plaintiff's claims against these defendants are insufficiently pled; he has not even alleged that these defendants were deliberately indifferent to his second-hand smoke exposure or medical needs, or that they violated his civil rights in any way, merely that they smoked at work.

In order to state a <u>Bivens</u> cause of action, a plaintiff must show that the defendants: 1) are federal agents; 2) acting under color of their authority; and 3) that they engaged in unconstitutional conduct. <u>See</u> <u>Bivens</u>*, supra* at 389. Plaintiff has failed to show, let alone even allege that these defendants engaged in unconstitutional conduct.  Further, because he suffered no harm from second-hand smoke exposure, he cannot show that their smoking had any causal connection to any injury he suffered.[87]   Accordingly, the complaint should be dismissed against these defendants for failure to state a claim upon which relief can be granted.

**F. <u>John and/or Jane Doe Defendants</u>**

---

[87] <u>Zatler</u>*, supra* at 401.

In addition to the named defendants, the plaintiff has also attempted to name "numerous FCI Gilmer employees, Officers, Secretaries, Counselors, Case Managers, etc." as defendants. The Court has construed this as an attempt by plaintiff to name John and/or Jane Doe defendants. A plaintiff may name a "John or Jane Doe" as a defendant when the identity of a defendant is unknown. Boyd v. Gullet, 64 F.R.D. 169 (D. Md. 1974). However, a district court is not required "to wait indefinitely" for the plaintiff to provide the defendant's true identity to the Court. Glaros v. Perse, 628 F.2d 679, 685 (1st Cir. 1980).

Plaintiff initiated this action on November 13, 2012. On March 19, 2013, when the defendants were ordered to answer, summonses were issued for the other named defendants; plaintiff was given an additional thirty days to provide identifying information for the John and Jane Doe defendants. On April 1, 2013, plaintiff filed a response to the Order to Answer, contending that he had had a tablet containing a list of over thirty more names of FCI Gilmer staff who were involved in smoking in restricted areas.[88] However, he alleges that when he was placed in the SHU at FCI Gilmer, as a further act of retaliation, the defendants confiscated it, and upon his arrival at FCI Coleman, it was not among his other personal property returned to him. Because of this, he avers he is unable to identify the remaining defendants. Because they have never been identified, service was never effected upon them.

It has been nearly eleven months since plaintiff filed his complaint. Federal Rule of Civil Procedure 4(c) indicates that "[a] summons must be served together with a copy of the complaint." The time frame within which service must be effected is articulated in Rule 4(m), which provides that if service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, "the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant." If the

---

[88] Dkt.# 22.

plaintiff demonstrates good cause for such failure, however, "the court shall extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m); see also, Bush v. City of Zeeland, 74 Fed. Appx. 581, 2003 WL 22097837 at *2 (6th Cir. 2003)(citations omitted).

Here, plaintiff was originally notified by Order of this Court, over four months after filing his complaint, that he had an additional thirty days in which to identify the potential John Doe and Jane Doe defendants. Plaintiff's response to the Order to Answer demonstrated good cause for his delay in identifying the John and Jane Doe defendants. However, even upon being granted the thirty-day extension of time, plaintiff did not provide the court with their identities. The plaintiff has had more than sufficient time to provide correct information in order to effectuate service on the potential John Doe/Jane Doe defendants in this action. Noting plaintiff's lack of diligence in doing so, the undersigned has no choice but to recommend that the plaintiff's claims against the John Doe/Jane Doe defendants be dismissed for failure to timely effect service.

## G. Retaliation

In order to sustain a claim based on retaliation, plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice, 40 F.3d 72, 75 (4th Cir.1994). Additionally, a plaintiff alleging that a government official retaliated against him in violation of a constitutional right must demonstrate, *inter alia,* that he suffered some adversity in response to her exercise of protected rights. American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993). Therefore, *"in forma pauperis* plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive [§ 1915(e)(2)(B) ]." Id. Furthermore, claims of

retaliation are treated with skepticism in the prison context.  <u>Cochran v. Morris</u>, 73 F.3d 1310, 1317 (4th Cir. 1996).

Here, plaintiff alleges that the defendants retaliated against him for filing administrative remedies over the BOP staff's exposing him to second-hand smoke, by denying him "jobs of any kind," repeatedly searching his cell, and confiscating his documentation of the names and dates specific staff were smoking on the job.  However, federal inmates have no constitutional right to participate in the BOP's administrative grievance proceedings; plaintiff even acknowledges this.[89]  Therefore, claims such as the plaintiff's, that BOP employees retaliated against him for pursuing his complaints through the administrative process, are not appropriate claims in a <u>Bivens</u> action.  Instead, "the legal consequences of conduct which makes the administrative remedy process unavailable to inmates is that the door to federal Court is open to proceedings on the merits of their claims without requiring their exhaustion of administrative remedies." <u>Murphy v. Inmate Systems Management, Inc., et al.</u>, 2008 WL 793631 (S.D. W.Va.). Therefore, to the extent that the defendant's actions might have prevented the plaintiff from exhausting his administrative remedies with respect to his claims regarding second-hand smoke exposure, he could have, and indeed, did pursue those claims in this Court upon arguing that he had been prevented from exhausting administrative remedies.  Therefore, plaintiff was not deprived of his right to pursue his claims in federal court, and thus has he has suffered no constitutional violation as a result of any alleged retaliation.   To establish a claim for denial of such access, the plaintiff would have to allege both a denial of court access and some prejudice resulting from the denial of access.[90]  Because he cannot do so, this claim against the defendants should be dismissed.

---

[89] Dkt.# 45 at 1-2.

[90] <u>Lewis v. Casey</u>, 518 U.S. 343, 351-352 (1996)(finding that a prison inmate retains a right to the courts but must allege that he suffered actual injury as a result of the defendant's actions to establish a constitutional violation).

## H.    Mootness

Article III of the United States Constitution limits the jurisdiction of the federal courts to cases or controversies.  Therefore, a case becomes moot when there is no viable legal issue left to resolve.  See Powell v. McCormick, 395 U.S. 486, 496 (1969).  If developments occur during the course of a case which render the Court unable to grant a party the relief requested, the case must be dismissed as moot.  Blanciak v. Allegheny Ludlum Co., 77 F.3d 690, 698-699 (3d Cir. 1996).

A review of this case shows that the plaintiff seeks injunctive relief against the defendants in the form of a directive forcing FCI Gilmer staff to immediately stop smoking inside the compound; a transfer to a smoke-free FCI, so that FCI Gilmer staff cannot retaliate against him for complaining about their smoking; and a transfer to a medical facility to receive biannual medical monitoring to screen him for cancer from second-hand smoke exposure.  However, "a claim for injunctive or declaratory relief must be dismissed as moot where the relief sought would, if granted, not make a difference to the legal interests of the parties."  Magee v. Waters, 810 F.2d 451, 452 (4th Cir. 1987) (transfer to another institution rendered inmate's request for injunctive relief moot)).  Here, the plaintiff has already been transferred away from FCI Gilmer. Where an inmate seeks injunctive relief from an allegedly unconstitutional prison condition, the prisoner's subsequent transfer from that prison renders the claim moot.[91]

## V.  Recommendation

---

[91] However, a prisoner's subsequent transfer from a complained-of prison, while it moots a request for declaratory and injunctive relief, it does not moot a request for money damages. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) quoting Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986).   Moreover, even in the absence of a showing of actual injury, a prisoner would still be entitled to nominal damages upon proof of a constitutional violation. Gray v. Spillman, 925 F.2d 90, 93 – 94 (4th Cir. 1991).

In consideration of the foregoing, it is the undersigned's recommendation that the defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Dkt.# 29) be **GRANTED;** and the plaintiff's complaint be **DISMISSED with prejudice.**

**Within fourteen (14) days** after being served with a copy of this report and recommendation, **or by November 4, 2013**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of such objections should also be submitted to the United States District Court. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet. The Clerk is further directed to provide a copy of this Report and Recommendation to any counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: October 21, 2013

/s/ James E. Seibert_____
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE